Filed 5/17/21  P. v. Souza CA6

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>DENNIS DALE SOUZA,<br><br>    Defendant and Appellant. | H047779<br>(Monterey County<br>Super. Ct. No. 18CR011585) |

## I.    INTRODUCTION

After the trial court denied his motion to quash the search warrant and suppress evidence (Pen. Code, § 1538.5), defendant Dennis Dale Souza pleaded no contest to possession of heroin for sale (Health & Saf. Code, § 11351),[1] misdemeanor possession of a controlled substance injection or ingestion device (§ 11364, subd. (a)), and misdemeanor possession of methamphetamine (§ 11377, subd. (a)).  The trial court sentenced defendant to two years in county jail pursuant to Penal Code section 1170, subdivision (h).

Defendant contends that the evidence against him must be suppressed because there was not probable cause to issue the search warrant and the police officer's reliance

---

[1] All further statutory references are to the Health and Safety Code unless otherwise indicated.

on the warrant was objectively unreasonable.  The Attorney General counters that the search warrant affidavit provided probable cause for the warrant and that even if there was not probable cause, the good faith exception to the exclusionary rule applies.

For reasons that we will explain, we determine that the search warrant affidavit established probable cause for issuance of the warrant because it provided the magistrate with " 'a substantial basis for concluding a fair probability existed that a search would uncover wrongdoing.'  [Citations.]" (*People v. Westerfield* (2019) 6 Cal.5th 632, 659 (*Westerfield*).)  Moreover, even if we were to find that there was not probable cause for the search, we would conclude that suppression is unwarranted because the officers executing the warrant relied on it in good faith.  (See *United States v. Leon* (1984) 468 U.S. 897, 923 (*Leon*).)  Accordingly, we affirm the judgment.

## II.     FACTUAL AND PROCEDURAL BACKGROUND

### A.     *Preliminary Hearing Evidence*

On December 5, 2018, Monterey Police Officer Jeremiah Ruttschow went to Saf Keep Storage and determined that defendant had a storage unit there.  Someone using defendant's personal access code had entered the storage facility approximately a half hour before Officer Ruttschow's arrival.  Video footage showed a white Lexus entering the facility when defendant's code was used.  The Lexus left the facility approximately 10 minutes later.

Pursuant to a search warrant, Officer Ruttschow subsequently searched defendant's storage unit, finding a small black pouch containing approximately 13.06 grams of suspected heroin in four small packages, approximately 1.01 grams of suspected methamphetamine in two small packages, and five methamphetamine pipes.  Officer Ruttschow also found over 100 small plastic baggies consistent with those used to package heroin, a digital scale, two syringes, and defendant's credit card.

Defendant stated that he had a couple grams of heroin in the storage unit and that he was a methamphetamine user but did not use heroin. Defendant admitted selling heroin and that he had been inside the white Lexus.

The parties stipulated that "the substances found [were] methamphetamine and . . . heroin."

**B.** *Charges*

An information was filed charging defendant with possession of heroin for sale (§ 11351), misdemeanor possession of a controlled substance injection or ingestion device (§ 11364, subd. (a)), and misdemeanor possession of methamphetamine (§ 11377, subd. (a)).

**C.** *Motion to Quash the Warrant and Suppress Evidence*

After the information was filed, defendant filed a motion to quash the search warrant and suppress the evidence against him (Pen. Code, § 1538.5), contending that the search warrant affidavit did not establish probable cause and that it was not objectively reasonable for the officer to rely on the warrant.

**1. Search Warrant Affidavit**

On December 5, 2018, Monterey Police Detective Jeff Reiland requested a warrant pursuant to Penal Code section 1524 seeking to seize evidence of stolen or embezzled property, property or things used as a means of committing a felony or public offense or concealing such property, and/or evidence tending to show a felony had been committed or a particular person had committed a felony. The search warrant affidavit specified the place to be searched as Saf Keep Self Storage, unit 29, in Del Ray Oaks and the property to be seized as a set of 1988 Ford Ranger keys, a Samsung cell phone charger, and several articles of clothing.

Detective Reiland submitted a six-page statement of probable cause signed under penalty of perjury as part of the affidavit. In the statement, Detective Reiland detailed that he had been a peace officer since August 2007 and was assigned to the field training

3

unit from November 2016 to October 2018, where he conducted and assisted in the investigation of hundreds of crimes including robbery, burglary, fraud, identity theft, and financial crimes. Detective Reiland stated that he had been assigned to the investigations unit since October 2018, where he conducted investigations, prepared and executed search warrants, and prepared cases for prosecution. Detective Reiland had attended over 600 hours of advanced officer training.

Detective Reiland averred that on December 4, 2018, at approximately 8:27 p.m., officers were dispatched to a reported disturbance at Del Monte Pines Motel. On the officers' arrival, the reporting party said that he saw three men walk toward room 7, heard sounds of a commotion coming from the room, and then saw the three men leave.

Detective Reiland stated that Monterey Police Officer Arrollo contacted room 7's occupant. The occupant told Officer Arrollo that when he opened the door after hearing a knock, three Hispanic men dressed in red pushed their way into his room, attacked him, and took his backpack. The backpack contained the occupant's 1988 Ford Ranger keys and wallet. The occupant then said that the men did not enter the room and his wallet was not missing, although he was unable to locate it. The occupant became uncooperative with Officer Arrollo and at one point stated that the backpack was empty, but he maintained that the backpack had been taken. The occupant believed the three men showed up because he was a Sureño gang member. The occupant declined to state whether he could identify the men.

Detective Reiland stated that at approximately 9:40 p.m., Officer Arrollo was directed to contact J.S., Sr., regarding the incident. J.S., Sr., told Officer Arrollo that he went to the motel with his son, J.S., Jr., and another man, later identified as defendant, to collect $1,200 that the occupant owed. When the three men entered the room, the occupant and a woman were there. J.S., Sr., told Officer Arrollo that the occupant said he could only pay half of what he owed. An argument ensued and the occupant told them to leave. J.S., Sr., stated that they took the backpack that was on the bed and left.

4

Detective Reiland averred that he spoke to J.S., Sr., at the police department at approximately 10:55 the following morning. J.S., Sr., stated that the occupant told defendant to come to the motel so that the occupant could pay him the money he owed. J.S., Sr., went to the motel with J.S., Jr., and defendant. After the men got the occupant's room number from the front desk, the occupant invited them into his room and said that he could only pay back half of the money owed. An argument ensued. The occupant pulled out a knife and swung it in the air. The occupant began fighting with J.S., Jr., who knocked the knife away. J.S., Sr., said that as they were leaving, the occupant threw a backpack at J.S., Jr., and J.S., Jr., "collected it." J.S., Sr., stated that the backpack contained a set of keys. J.S., Sr., dropped J.S., Jr., and defendant off at the Elks Lodge. About an hour and a half later, J.S., Sr., got a call from J.S., Jr., to pick him up. Detective Reiland did not find any incoming calls on J.S., Sr.'s phone that corroborated his statement.

Detective Reiland stated that at approximately 11:58 a.m., J.S., Jr., arrived at the police department and agreed to speak with him. J.S., Jr., said that he went to the motel with J.S., Sr., and defendant to collect a debt. The front desk gave J.S., Sr., the occupant's room number. J.S., Jr., said that the occupant invited them into the room and that there was a woman inside. According to J.S., Jr., an argument began between defendant and the occupant when the occupant stated that he could only pay back some of the money. The occupant "starting then telling [defendant] that he was burned and screwed and that he was not going to pay him his money." The occupant pulled a knife. J.S., Jr., initially told Detective Reiland that he did not fight with the occupant, but then admitted to punching the occupant and getting punched. As they were leaving, the occupant threw a backpack at them. J.S., Jr., picked up the backpack and they left. J.S., Jr., stated that the backpack contained a cell phone charger and a pair of sunglasses. J.S., Jr., said that he threw the backpack into a trashcan at the Elks Lodge.

5

Detective Reiland averred that after he asked J.S., Jr., about the inconsistencies in his story, J.S., Jr., admitted that the occupant had not been expecting them, but insisted that the occupant had invited them into his room. J.S., Jr., was placed under arrest and read his *Miranda* rights.[2] J.S., Jr., agreed to speak to Detective Reiland.

Detective Reiland stated that J.S., Jr., said that "[b]efore the robbery, [J.S., Jr.,] received a call from [J.S., Sr.,] asking him to go with [defendant] and [J.S., Sr.,] to the motel." J.S., Jr., knew they were going to the motel to collect the money and J.S., Sr., wanted him to go because he and defendant believed the occupant had "other people (who he described as southsiders) at the motel." J.S., Sr., and J.S., Jr., convinced the front desk to give them the occupant's room number. J.S., Jr., knocked on the door to the occupant's room while defendant stood out of sight. When the occupant answered the door, defendant pushed the door open and the three men entered. Defendant demanded the money. When the occupant stated that he was not going to pay him, defendant went through some drawers but did not take anything. J.S., Jr., then physically fought with the occupant, who brandished a knife at him. J.S., Jr., stated that the occupant threw his backpack at him and he left with it. The backpack contained a pair of sunglasses and a cell phone charger. The men went to the Elks Lodge, and J.S., Jr., went inside with defendant and "another friend." J.S., Jr., said that he threw the backpack into a trashcan at the Elks Lodge.

Detective Reiland averred, "[J.S., Jr.,] said he did not see any weapons, but heard a metal click and saw [defendant] put something in his pants. [J.S., Jr.,] said it could have possibly been a handgun since he saw [defendant] with a handgun three days ago at his storage unit in Del Ray Oaks. [J.S., Jr.,] provided a general area . . . where [defendant's] storage unit was located." Detective Reiland stated that J.S., Sr., was the

---

[2] *Miranda v. Arizona* (1966) 384 U.S. 436.

registered owner of a black Corvette and that J.S., Sr., and J.S., Jr., stated that the three men went to the Elks Lodge in the Corvette.

Detective Reliand stated that Officer Reed found an empty backpack in a trashcan near the Elks Lodge's front door. Surveillance footage showed three people getting out of a Corvette, including J.S., Jr., who was carrying a backpack. The footage showed J.S., Jr., going through the backpack, removing numerous items, and putting them in his pockets. J.S., Jr., then put the backpack in a trashcan by the front door and went to the parking lot. Defendant was also captured on the surveillance footage.

Detective Reliand averred that Sergeant Ruttschow located the woman who was in room with the occupant. The woman told Sergeant Ruttschow that when the occupant opened the door after hearing a knock, three men forced their way inside. The occupant was pushed backwards towards the bathroom, but the men seemed surprised when they saw her in the room and appeared uncertain about what to do. The woman did not understand what was being said, but the interaction was confrontational from the outset. When she stood up to intervene, she was shoved to the ground. Someone mentioned " 'gun,' " but the woman never saw a gun and did not know if anyone had one. The men took a backpack that was on the bed and left. The woman said the men may have also taken some cell phone chargers. The woman was unable to identify the men, but the descriptions she gave were similar to J.S., Sr., J.S., Jr., and defendant.

Detective Reiland stated that defendant arrived at the police department at approximately 3:40 p.m. Defendant was placed under arrest, *Mirandized*, and agreed to speak to the detective. Defendant said that the occupant told him to come over so he could pay defendant the money he owed him. Defendant first stated that the occupant gave defendant his room number, but defendant later admitted that the occupant did not tell him what room he was in. Defendant said that the occupant invited them into the room and pulled a knife on them. Defendant subsequently stated that the occupant tried to shut the door on J.S., Jr., but they pushed the door open and went inside. Defendant

7

said that the occupant tried to stab J.S., Jr., and told them to " 'get the fuck out.' " Defendant stated that "[J.S., Jr.,] and [the occupant] got into a fistfight, but that [J.S., Jr.,] was defending himself." The men left after the altercation. The occupant threw a backpack at J.S., Jr. Defendant initially said the backpack was empty but later stated there was toilet paper and a bag of baggies inside. J.S., Sr., dropped defendant and J.S., Jr., off at the Elks Lodge. A friend took defendant to his room at the Oceanside Inn. Defendant denied searching the occupant's belongings or the drawers in the occupant's room, although he said he was unsure whether he touched the backpack. Detective Reiland asked to look at defendant's phone to confirm whether the occupant had called him, but defendant refused. Defendant indicated that he was currently homeless. Police confirmed that defendant had been a guest at the Oceanside Inn but had checked out earlier that day.

Detective Reiland averred that Sergeant Ruttschow went to Saf Keep Storage in Del Rey Oaks and was told that defendant had a storage unit there. The facility's staff provided Sergeant Ruttschow with a copy of defendant's identification from defendant's rental file and with surveillance footage that showed a car entering the facility's gate on December 5, 2018 at 2:26 p.m., after someone used defendant's personally assigned gate code. The vehicle left the facility at 2:38 p.m., which was approximately one hour before defendant arrived at the police department.

Detective Reiland stated that he ran defendant's criminal history and learned that defendant was a convicted felon forbidden from possessing, purchasing, or owning any firearms or ammunition. Detective Reiland averred that based on his training and experience, he knows that people who commit violent crimes and are gang members or associate with gang members often possess firearms, ammunition, and other weapons to protect themselves and instill fear in their victims and that "[i]n this case, [J.S., Jr.,] mention[ed] hearing a metal click that could have been a firearm and saw [defendant] with a firearm three days prior to this event at his storage unit. [The woman] also heard

8

someone mention 'gun' while in the room." Detective Reiland stated that based on his training and experience, he knows that "thieves commonly conceal stolen items inside storage units because they do not have a permanent residence. [Defendant] provided his address as the Salvation Army, 800 Scott Street, which . . . allows subjects to receive mail only. Salvation Army does not allow residential housing at this location." Detective Reiland "believe[d] the search of [defendant's] storage unit will lead to the discovery of the stolen property as well as clothing worn by [defendant] during this crime" and "believe[d] searching this location will lead to further evidence to support that [defendant] is in possession of the stolen items." Detective Reiland stated that based on his training and experience, there was probable cause to believe, and he did believe, that grounds existed for the issuance of a search warrant.

## 2. Motion to Quash and Suppress, Opposition, and Hearing

Defendant contended in his motion to quash the search warrant and suppress the evidence that the affidavit did not establish probable cause that contraband or evidence of a crime would be found in his storage unit and that the good faith exception to the exclusionary rule did not apply. Defendant argued that there was not probable cause to believe that a crime had occurred or that there was evidence to recover and that the affidavit did not establish a nexus between the storage unit and the items sought.

The prosecution filed written opposition to the motion, asserting that the affidavit established probable cause to justify the search and that the officers relied on the warrant in good faith, rendering suppression of the seized evidence unwarranted. The prosecution argued that the affidavit detailed that defendant and his associates admitted they were in a confrontation with someone and took an item of property and that someone had accessed defendant's storage unit using defendant's personal code approximately an hour before defendant gave his statement to the police.

The trial court determined that the affidavit established probable cause. The court observed that the affidavit indicated that defendant did not have a residence but that

9

officers learned that defendant had a storage unit that he accessed the afternoon after the incident and shortly before he went to the police station. The court stated, "[T]he fact that he goes there . . . shortly before he goes . . . to the police station, I could understand why that would lead an officer to believe the stolen goods were put there when he doesn't have a normal residence."[3] The court further found that the exclusionary rule would not serve its purpose in this case because there was no reason for the officers executing the warrant to believe the search was unlawful.

### D.     *Pleas and Sentencing*

Defendant pleaded no contest to the charges. The trial court sentenced defendant to two years in county jail pursuant to Penal Code section 1170, subdivision (h).

## III.     DISCUSSION

Defendant contends that the evidence against him must be suppressed because there was not probable cause to issue the warrant as the affidavit did not establish a connection between the evidence to be seized and the location to be searched. Defendant argues that the fact that he was with J.S., Jr., on December 4, 2018, and that someone entered and exited his storage unit the next day does not constitute probable cause to search the unit because defendant was not seen in possession of the evidence, there was no reason to believe the evidence was in his storage unit, and "a generalized speculation that homeless thieves keep their possessions in storage lockers is legally insufficient." Defendant further contends that the evidence must be suppressed because reliance on the warrant was objectively unreasonable as the affidavit "literally attributed the possession of the desired evidence to someone *other* than the subject of the warrant" and there were no facts stated in the affidavit that the evidence sought could be found in defendant's storage unit.

---

[3] The court stated that it did not rely on the information in the affidavit about a gun because the affidavit did not include a gun as an item of property to be seized.

10

The Attorney General counters that the affidavit established probable cause to search defendant's storage unit as it demonstrated a fair probability that defendant was "involved in taking [the] backpack" and that defendant would have received at least some of the backpack's contents given that defendant and his associates went to the motel room to collect the money the occupant owed defendant. The Attorney General argues that because the affidavit established that defendant was homeless, the magistrate could reasonably infer that defendant would keep "the spoils of his crimes" in his storage unit and that evidence of defendant's crime would be in the unit since defendant appears to have accessed the unit shortly before he arrived at the police department. The Attorney General alternatively contends that even if there was not probable cause to issue the warrant, the good faith exception to the exclusionary rules applies because the affidavit "was not so 'plainly deficient' that no reasonable well-trained officer could have relied on it."

## A.    *Legal Principles*

"The Fourth Amendment to the United States Constitution prohibits 'unreasonable searches and seizures' and requires search warrants to be issued only upon a showing of 'probable cause' describing with particularity 'the place to be searched, and the . . . things to be seized.' " (*Westerfield*, *supra*, 6 Cal.5th at p. 659.)  " 'Probable cause sufficient for issuance of a warrant requires a showing that makes it " 'substantially probable that there is specific property lawfully subject to seizure presently located in the particular place for which the warrant is sought.' " [Citation.]  That showing must appear in the affidavit offered in support of the warrant. [Citation.]' [Citation.]  'The showing required in order to establish probable cause is less than a preponderance of the evidence or even a prima facie case.' [Citation.]" (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 369-370.)  The existence of probable cause for issuing a search warrant is measured by a "totality-of-the-circumstances approach." (*Illinois v. Gates* (1983) 462 U.S. 213, 230 (*Gates*).)  " 'The task of the issuing magistrate is simply to make a practical,

commonsense decision whether, given all the circumstances set forth in the affidavit . . . , including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.' " (*People v. Kraft* (2000) 23 Cal.4th 978, 1040-1041, quoting *Gate*s, *supra*, at p. 238.)

" 'The question facing a reviewing court asked to determine whether probable cause supported the issuance of the warrant is whether the magistrate had a substantial basis for concluding a fair probability existed that a search would uncover wrongdoing.' [Citations.]" (*Westerfield*, *supra*, 6 Cal.5th at p. 659.) We review the magistrate's determination of probable cause deferentially and overturn it " 'only if the affidavit fails as a matter of law to set forth sufficient competent evidence' supporting the finding of probable cause." (*Id.* at p. 660.) " ' "Although in a particular case it may not be easy to determine when an affidavit demonstrates the existence of probable cause, the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants." ' [Citations.]" (*People v. Weiss* (1999) 20 Cal.4th 1073, 1082-1083.)

## B. *The Affidavit Established Probable Cause*

Defendant contends that the affidavit failed to establish probable cause because it did not provide a nexus between the evidence sought and his storage unit. While defendant concedes that there was "reason to believe that [he] was involved in an altercation with [the occupant of room 7]," he argues that there was "no reason *at all* to believe that evidence of that altercation would be found at [his storage unit]" since the affidavit demonstrated that the occupant's property was taken by J.S., Jr., and did not contain any information that J.S., Jr., gave the property to defendant or left it at defendant's storage unit. We are unpersuaded.

"The affidavit must establish a nexus between the criminal activities and the place to be searched. [Citation.]" (*People v. Garcia* (2003) 111 Cal.App.4th 715, 721.)

12

However, a magistrate " 'is entitled to rely upon the conclusions of experienced law enforcement officers in weighing the evidence supporting a request for a search warrant as to where evidence of crime is likely to be found. [Citation.] It is not essential that there be direct evidence that such evidence will be at a particular location. Rather, the magistrate " 'is entitled to draw reasonable inferences about where evidence is likely to be kept, based on the nature of the evidence and the type of offense.' " [Citation.]' " (*People v. Lazarus* (2015) 238 Cal.App.4th 734, 764.)

Here, there was " 'a substantial basis' " for the magistrate to conclude that there was " 'a fair probability' " that evidence of defendant's altercation with the occupant of room 7 and stolen property would be found in defendant's storage unit based on the nature of the crime, defendant's homelessness, the entry into the storage facility with defendant's personal code the day after the incident and roughly an hour before defendant's arrival at the police department, and Detective Reiland's statement that in his experience, "thieves commonly conceal stolen items inside storage units because they do not have a permanent residence." (*Westerfield*, *supra*, 6 Cal.5th at p. 659.) The affidavit established that defendant, J.S., Sr., and J.S., Jr., went to room 7 to collect the money the occupant owed defendant. The occupant, the woman inside the room with him, defendant, and J.S., Jr., all stated that the men forced or pushed their way inside, although defendant and J.S., Jr., initially denied doing so. After a physical fight between J.S., Jr., and the occupant, the men left with the occupant's backpack.

Although J.S., Sr., and J.S., Jr., told the police that it was J.S., Jr., who left the room with the backpack and surveillance footage later captured J.S., Jr., going through the backpack and pocketing its contents, the affidavit demonstrated that the occupant owed defendant money and that J.S, Jr., went to the motel to help defendant collect it. Moreover, the surveillance footage established that defendant was present at the location where J.S., Jr., was going through the backpack and taking its contents. In addition, J.S., Jr., told Detective Reiland that defendant demanded money from the occupant and

13

went through some drawers at the motel room. While defendant denied to Detective Reiland that he went through any drawers, defendant admitted knowledge of the backpack's contents, first stating that it was empty but later saying there was toilet paper and baggies inside. Defendant could also not be sure whether he touched the backpack. From this information in the affidavit, the magistrate could reasonably infer that defendant, not J.S., Jr., would ultimately take possession of any property stolen from the occupant as it was defendant who was owed the money and the reason for the men's conduct was to recoup the occupant's debt.

The affidavit further established that defendant was homeless and rented a storage unit. The day after the offense and approximately one hour before defendant arrived at the police department, someone using defendant's personal code entered the storage facility. Detective Reiland stated in the affidavit that "[b]ased on [his] training and experience, [he] know[s] thieves commonly conceal stolen items inside storage units because they do not have a permanent residence" and averred his "belie[f] [that] the search of [defendant's] storage unit [would] lead to the discovery of the stolen property as well as clothing worn by [defendant] during this crime." Given defendant's lack of a permanent residence, his rental of a storage unit, the access of the storage facility with defendant's personal code the day after the incident and shortly before defendant went to the police department, and Detective Reiland's experience with thieves concealing stolen property inside storage units, the magistrate had " 'a substantial basis' " to conclude that there was " 'a fair probability' " that evidence of the offense and stolen property would be inside the unit. (*Westerfield*, *supra*, 6 Cal.5th at p. 659.)

Defendant relies on *People v. Pressey* (2002) 102 Cal.App.4th 1178 (*Pressey*) to argue that the affidavit did not establish probable cause. In *Pressey*, the magistrate's finding of probable cause to search the defendant's residence rested on the defendant's simple possession of controlled substances during a traffic stop and an experienced officer's opinion "that drug users with controlled substances on their person or in their

14

car are likely to have more of those substances where they live." (*Id.* at p. 1182.) The Court of Appeal held that "probable cause to search the residence of someone suspected of using illegal drugs requires more than an opinion or inference, available in every case, that drugs are likely to be present." (*Id.* at p. 1190.)

In reaching its decision, the court observed that while some courts have upheld a warrant to search a *drug dealer's* residence based solely on evidence that the occupant was a dealer coupled with an experienced narcotics officer's opinion that contraband would likely be found in the dealer's home, other courts have required additional facts concerning the residence, " 'such as that the seller went to his home prior to the sale, or that the sale occurred near the home, which would support the inference that the supply is probably located there.' " (*Pressey*, *supra*, 102 Cal.App.4th at p. 1183.) Nonetheless, the court was unaware of any decision finding probable cause to search a drug user's home based solely on the user's simple possession of narcotics and the court declined to so hold, citing the differences inherent in drug trafficking versus drug use, the heightened expectation of privacy in the home, and concern over the breadth of such a rule as "there may be some reason to suspect that 'everyone engaged in criminal activity (drugs or otherwise), keeps evidence of the criminal activity at home.' " (*Id.* at p. 1190.) The court stated that its holding "does not mean that probable cause to search a home could never arise from the particularized suspicions of an experienced narcotics officer, or the circumstances of an arrest for drug possession, only that illegal drug use does not necessarily provide probable cause to search the user's residence, and that such cases must be decided on their own facts." (*Ibid.*)

We find *Pressey* distinguishable. Beyond the evidence that linked defendant to the crime and the motive evidence that provided a reasonable inference that defendant would ultimately possess the property taken from room 7's occupant as the occupant owed defendant money, the fact that the day after the incident and approximately one hour before defendant went to the police department someone using defendant's personal

15

code accessed the storage facility where defendant rented his unit provided a sufficient nexus between the crime and the storage unit.

For these reasons, and given the deference afforded a magistrate's determination that there was probable cause to issue a search warrant, we determine the magistrate had " 'a substantial basis for concluding a fair probability existed that a search [of defendant's storage unit] would uncover wrongdoing.' " (*Westerfield*, *supra*, 6 Cal.5th at p. 659.) The affidavit did not " 'fail[] as a matter of law to set forth sufficient competent evidence' supporting the finding of probable cause." (*Id.* at p. 660.)

## C.    *The Good Faith Exception Applies*

Even if we were to conclude that there was not probable cause to issue the warrant, we would determine that the good faith exception precludes application of the exclusionary rule here.  In *Leon*, the Supreme Court held that when "an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope," the "marginal or nonexistent benefits" produced by suppressing the evidence obtained "cannot justify the substantial costs of exclusion." (*Leon*, *supra*, 468 U.S. at pp. 920, fn. omitted, 922.)  The court observed that the purpose of the exclusionary rule is to chill future police transgressions; the rule is not designed to punish the actions of errant judges or magistrates.  (*Id.* at p. 916.)  Thus, suppression of evidence is appropriate only if (1) "the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his [or her] reckless disregard of the truth"; (2) "the issuing magistrate wholly abandoned his [or her] judicial role" such that "no reasonably well trained officer should rely on the warrant"; (3) the affidavit was " 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable' "; or (4) the affidavit was so deficient in particularizing the place to be searched or the things to be seized that the executing officer "cannot reasonably presume it to be valid." (*Id.* at p. 923.)  In considering the issue, we apply the objective test of "whether a reasonably well trained

16

officer would have known that the search was illegal despite the magistrate's authorization." (*Id.* at p. 922, fn. 23; see also *People v. Camarella* (1991) 54 Cal.3d 592, 606 [if "a reasonable and well-trained officer 'would have *known* that his [or her] affidavit failed to establish probable cause,' " suppression is warranted, but if such an officer "reasonably could have believed that the affidavit presented a close or debatable question on the issue of probable cause," the good faith exception applies].)

Defendant contends that the third circumstance is present here as no reasonable officer would have believed that there was probable cause because the affidavit attributed possession of the evidence to someone else (presumably, J.S., Jr.) and "there were no facts stated in the affidavit, particularized or otherwise, that the evidence in question could be found [in defendant's storage unit], short of a conclusory observation that [he] is homeless."

We determine that a "reasonably well trained officer" would not have "known" the affidavit failed to establish probable cause. (*Leon*, *supra*, 468 U.S. at p. 922, fn. 23.) Detective Reiland's probable cause statement detailed that several individuals, including defendant himself, implicated defendant in the altercation with room 7's occupant and the theft of the occupant's backpack. The probable cause statement also included corroboration of the individuals' accounts, namely, surveillance footage showing someone who appeared to be defendant at the Elks Lodge after the incident with individuals who matched J.S., Sr.'s and J.S., Jr.'s descriptions and the police's recovery of an empty backpack in a trashcan near the Elks Lodge's front door. Although the footage showed J.S., Jr., rifling through the backpack and pocketing its contents before throwing the backpack in the trash, the affidavit established that the incident occurred because the occupant owed defendant money, as defendant himself admitted, demonstrating a reasonable likelihood that defendant would ultimately possess the items taken from the occupant.

17

Relying on another case involving a warrant to search a drug user's residence, *United States v. Garcia* (2011) 809 F.Supp.2d 1165, defendant argues that "the only basis on which the police could point to [defendant] actually possessing stolen items in his storage locker was the conclusory assertion that 'thieves commonly conceal stolen items inside storage units because they do not have a permanent residence.' " However, as we explained above, the affidavit contained more than Detective Reiland's opinion based on his training and experience to establish probable cause that evidence of the incident would be found in defendant's storage unit. The affidavit showed that police corroborated defendant's homeless status and rental of a storage unit. In addition, the affidavit established that surveillance footage from the storage facility revealed that defendant's personal code was used to enter the facility the day after the offense and approximately one hour before defendant arrived at the police department, which reasonably linked defendant's storage unit to the incident. And, because the affidavit demonstrated that the motive for the incident was to recoup the occupant's debt to defendant, we do not agree with defendant's assertion that "[n]o other facts were submitted in the affidavit to suggest that [defendant] would have had the evidence." The debt motive, stated in the affidavit as consistently recounted by J.S., Sr., J.S., Jr., and defendant, provided a fair probability that defendant would indeed possess the evidence. Thus, on this record, we determine that the officers executing the warrant relied in good faith on the warrant's issuance. (See *Leon*, *supra*, at 468 U.S. at p. 923.)

For these reasons, we conclude that the trial court did not err in denying defendant's motion to suppress.

## IV.    DISPOSITION

The judgment is affirmed.

18

_____

BAMATTRE-MANOUKIAN, J.

WE CONCUR:

_____

ELIA, ACTING P.J.

_____

DANNER, J.

***People v. Souza***
**H047779**